IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARY JO CONNAWAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 21-cv-264-SMY |
| | ) |
| JEFFERSON COUNTY, ILLINOIS, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

**YANDLE, District Judge:**

Plaintiff Mary Jo Connaway filed the instant lawsuit against Defendant Jefferson County, Illinois, asserting violations of Title VII of the Civil Rights Act of 1964, the Illinois Human Rights Act ("IHRA"), and the Americans with Disabilities Act ("ADA"). Defendant moves for summary judgment (Doc. 48), which Plaintiff opposes (Doc. 58). For the following reasons, the motion is **GRANTED**.

**Factual Background**

Construed in the light most favorable to Plaintiff Connaway, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motions: Defendant Jefferson County, Illinois (the "County") is a local government entity that operates a jail (Doc. 49-2, ¶ 3). Plaintiff Mary Jo Connaway began working for the County in 2007 and became a full-time correctional officer in October 2008 (Doc. 59-2, p. 12).

Jefferson County correctional officers are responsible for all aspects of ensuring the security, safety, and care of the incarcerated persons, including booking, intake, dispensing medications, providing food, arranging for outdoor time, providing for secure movement to visit with attorneys, attending court hearings, and transporting to outside medical facilities (Doc. 49-4,

pp. 17-20; Doc. 49-2, at ¶ 4). Correctional officers work 12-hour shifts, and each officer rotates in four-hour increments among four different job functions: booking, well-being, relief, and control (Doc. 59-2, p. 17, pp. 26-27; Doc. 59-3, -p. 60; Doc. 59-4, pp. 18-20; Doc. 59-5, p. 52).

One of the duties of correctional officers is to work in the control room watching the jail facility via camera monitors, controlling all doors and movement within the facility, and keeping control of the keys and less-than-lethal weapons (Doc. 49-4, pp. 19-20; Doc. 49-5, p. 51). The control room is the only regularly assigned duty for correctional officers that does not involve direct physical contact with detainees and that is always monitored by video and audio (Doc. 49-4, p. 27; Doc. 49-3, pp. 131-132). Connaway believes the control room was the most stressful job in the jail because there was constant activity and noise (Doc. 59-1, at ¶ 3).

The County generates revenue by housing prisoners from other counties and from federal agencies, such as the United States Marshals Service (Doc. 49-4, pp. 25-26, 138; Doc. 49-3, p. 50). Federal detainees are integrated with the rest of the population at the jail, and there is no reasonable operational way to keep federal detainees segregated from the rest of the jail population (Doc. 49-3, pp. 51-52; Doc. 49-2, at ¶ 5).

### *Connaway's Disciplinary History*

Connaway had been involuntarily terminated for misconduct by the County on two separate occasions prior to Jeff Bullard's election as County Sheriff in 2018 (Doc. 49-4, p. 37; Doc. 49-5, p. 55). She was later reinstated by labor arbitrators who converted the terminations into long-term disciplinary suspensions. *Id*.

There was an open investigation regarding Connaway when Sheriff Bullard was elected (Doc. 49-3, pp. 69-70; Doc. 49-7, p. 97). The investigation involved serious allegations of misconduct by Connaway regarding three federal prisoners (Doc. 49-8; Doc. 49-4, p. 133). While

that investigation remained pending, the U.S. Marshals Service removed all federal prisoners from the Jefferson County Jail (Doc. 49-7, p. 63; Doc. 49-2, at ¶ 6).  Connaway continued working on the floor and had physical contact with inmates (Doc. 59-1, at ¶ 5; Doc. 59-26, pp. 85-86, 120). Connaway believed that the investigation had been concluded and that the allegations made against her were unfounded (Doc. 59-1, ¶ 4; Doc. 59-2, p. 83).

After assuming office in December 2018, Sheriff Bullard reviewed the open investigation and concluded the evidence supported disciplining Connaway for an attempted battery conspiracy between inmates and unauthorized dispensing of phone cards to inmates (Doc. 49-4, pp. 84-86; Doc. 49-9; Doc. 49-3, pp. 76-79, 126).  Connaway received a written reprimand and assignment to the control room on an indefinite basis so that she could not directly interact with the inmate population (Doc. 49-4, p. 206).  The written reprimand and indefinite assignment to the control room were sustained through a grievance process between Connaway's union and the County (Doc. 49-8; Doc. 49-4, pp. 206-207).  The U.S. Marshals Service resumed sending federal inmates to the Jefferson County Jail after Connaway was assigned to the control room but advised the County that it would remove the inmates if Connaway had access to them (Doc. 49-10; Doc. 49-3, p. 201; 49-7, pp. 66-68; Doc. 49-2, at ¶ 7).

Connaway received several disciplinary infractions in 2019 and 2020, including:

(1) January 2019 – a written reprimand for conduct unbecoming an officer for not following the instructions of the officer-in-charge on December 24, 2018, and a 5-day suspension (later reduced to 2 days) for giving false or misleading statements, and of a lack of candor during the related investigation (Doc. 49-4, p. 80; Doc. 49-11).

(2)  April 2019 – a 2-day suspension for missing a mandatory CPR training session on March 25, 2019 (Doc. 49-4, pp. 95-96; Doc. 49-12).  Connaway contacted Lieutenant Burrell to see if she could come in on her day off to make up the training, but was told no (Doc. 59-7, pp. 106-107).

(3) May 2019 – a 2-day suspension for violating the "keep separate" policy and procedure and for failure to notify a supervisor of a potential emergency due to the keep separate violation (Doc. 49-4, pp. 99-100; Doc. 49-13; Doc. 49-3, p. 160). Connaway stated that she did not see the flag or warning indicating that a keep separate order existed (Doc. 59-2, pp. 104-105).

(4) January 2020 – a 7-day suspension (later reduced to 5 days) for repeated safety violations, in this instance violating the cell phone policy by bringing her personal cell phone into the control room, using it, and attempting to hide it under the work counter so it could not be viewed by the cameras in the control room (Doc. 49-4, pp. 117-124; Doc. 49-14; Doc. 49-3, p. 179). It is against County policy to have a cell phone in inmate areas or in the control room. Supervisors are allowed to have cell phones on the floor or in the control room (Doc. 49-4, p. 121; Doc. 49-3, p. 167; Doc. 49-5, p. 126).

(5) April 2020 – a 5-day suspension based on repeated safety violations, again for having a cell phone in the control room (Doc. 49-4, pp. 127-131; Doc. 49-15).

The investigations into Connaway's disciplinary infractions were usually conducted by Lieutenant Mansker; Sheriff Bullard did not conduct the investigations (Doc. 49-4, p. 146; Doc. 49-3, p. 162). Lieutenant Mansker followed the same process as to all personnel investigations that may lead to the discipline of employees, including interviewing the accused employee and other witnesses, gathering documents and video and audio recordings, and making assessments of credibility and candor (Doc. 49-2, at ¶ 9). Sheriff Bullard issued discipline based on the investigation findings, the step in progressive discipline, and the comparative treatment of others for misconduct. *Id.* at ¶ 10.

In the fall of 2019, the County received a report that Connaway had brought her cell phone into the control room. Subsequently, Sheriff Bullard authorized Lieutenant Mansker's request to set up a camera underneath the control room desk (Doc. 59-6, pp. 146-147). Lieutenant Mansker instructed Lieutenant Nancy Burrell to place a camera under the control room desk to monitor whether Connaway was using her phone under the desk out of sight of the other cameras (Doc. 49-5, pp. 123-124; Doc. 4923, pp. 167-170). Connaway discovered the camera disguised as a phone charger under her desk pointed at her crotch the first day the County used it. She reported it to

Lieutenant Burrell, and no evidence was gained from it (Doc. 49-3, p. 169, Doc. 49-7, p. 127). The camera was in place for less than one day. *Id*. On December 9, 2019, Connaway filed a complaint with the Illinois Department of Human Rights alleging, in part, a hostile and intimidating environment, based on the camera she found in the control room (Doc. 49-3, p. 171).

In her deposition, Connaway testified that Sheriff Bullard and Lieutenant Mansker never said anything to her that she identified as sexist. *Id*. at pp. 147-148. She could not identify any time when they used derogatory terms regarding her or other female officers or used sexist slurs or profane comments about women correctional officers. *Id*. She could not recall either of them saying that women are not capable of being very good, capable, proficient correctional officers. *Id*. The only example of a sexist comment Connaway could recall was Sheriff Bullard telling her on one occasion, "I know how manipulative you are. You're not going to get away with that here." The comment was made in the presence of Lieutenant. Nancy Burrell, and Connaway interpreted it as insinuating she was manipulative because of her sex (Doc. 59-2, p. 150, pp. 238-239; Doc. 59-3, pp. 90-91; Doc. 59-7, pp. 65-66).

Connaway claimed that Scott Smith, a male detective with the County, failed to attend a meeting between personnel and Sheriff Bullard shortly after he was elected. Sheriff Bullard issued Smith a counseling for missing the meeting (Doc. 59-3, p. 154; Doc. 59-7, p. 109). On one occasion during Sheriff Bullard's administration, the County mandated Officer Garcia, a male, to come into work. Sheriff Bullard testified that Garcia requested to be excused from the mandate because he needed to work on his roof (Doc. 59-3, pp. 180-181; Doc. 59-8, pp. 48-53). On another occasion, Connaway complained to Lieutenant Mansker that Sergeant Garcia had violated a keep separate order (Doc. 59-18). Garcia testified that he was written up and received a verbal warning for cell phone usage (Doc. 59-8, pp. 53-55). Correctional officer Stephen Yandell, a male, was

caught with a cell phone in the control room twice in four months. The County issued him a coaching for the first offense and issued him a three-day suspension for the second offense (Doc. 59-3, p. 184; Docs. 60-4-6).

No male correctional officers have a similar discipline history to Connaway, including prior terminations and suspensions, who have not received similar progressive discipline for similar offenses (Doc. 49-2, at ¶ 8). Connaway has no personal knowledge of other correctional officers' disciplinary histories (Doc. 59-2, p. 157).

### *Connaway's Requests for Accommodations*

Connaway has been diagnosed with migraine headaches (Doc. 49-4, p. 189). She first notified the County of her migraines with a doctor's note in 2016 or 2017. *Id*. at pp. 190-191. The migraines are often triggered and/or exacerbated by bright lights and sensitivity to light, loud sounds, and stress (Doc. 59-1, at ¶ 8; Doc. 59-2, pp. 196-197; Doc. 59-9, pp. 15-19).

On April 11, 2019, Connaway complained to former Jail Administrator Scott that the County's instruction that lights in the control room must be turned down affected her migraines. *Id*. She also notified the County that her indefinite assignment to the control room increased the frequency of her migraines and that she could not have the light contrast based on her migraines (Doc. 59-3, pp. 143-144; Doc. 60-11). The next day, the County instituted a new directive that required officers to keep the lights in the control room at their lowest setting (Doc. 59-3, pp. 148-149; Doc. 60-12).

The lights in the control room are kept dim so the inmate population cannot see what is inside, including weapons, radios, other jail equipment, and information contained on the computer screens or paperwork. The safety glass surrounding the control room is reflective in such a way that if the lights are turned up, detainees can see in the control room (and the correctional officer

cannot see out).  If the lights are dim, the correctional officer can see out, but the detainees cannot see in (Doc. 49-3, pp. 137-138; Doc. 49-6, pp. 122-129).  There had been a practice of keeping the lights dim before the directive was issued and Connaway's complaint (Doc. 59-6, pp. 140-141).

Connaway requested to not be assigned to the control room because she believed that the work triggered her migraines, but there are no other jobs that do not require direct physical interaction with detainees (Doc. 49-4, pp. 212-214; Doc. 49-3, pp. 217-220).  The County would not allow Connaway to go back to performing duties that would involve direction interaction with inmates including federal inmates (Doc. 49-4, pp. 199-204).

Connaway's doctor, Dr. Mark Whealy, provided her with a letter that encouraged the County to see if there was a position "more conducive to her migraines" than the control room.  Dr. Whealy testified that he is unaware of why Connaway was assigned to the control room.  He also testified that he did not know if there were any other available jobs or duties to which Connaway could be assigned.  He did not suggest any other accommodations (such as assistive devices), and did not correspond directly with the County regarding other possible accommodations (Doc. 49-17, pp. 29-30, pp. 41-47).

Connaway requested a desk lamp as an accommodation for her migraines, which the County provided (Doc. 49-4, p. 199; Doc. 49-3, pp. 147-148; Doc. 49-5, pp. 87-88; Doc. 49-7, pp. 138-139).  She also requested to take more breaks from the control room.  As an accommodation, the County allowed Connaway to conduct perimeter checks by walking around the outside of the jail.  Perimeter checks are usually performed by lieutenants or sergeants (Doc. 49-4, pp. 201-202; Doc. 49-3, pp. 147-148; Doc. 49-5, pp. 98, 119; Doc. 49-6, pp. 135-136).  The times Connaway conducted the checks were inconsistent, did not occur daily, and required proper staffing for

someone to relieve her in the control room when the checks were to be conducted (Doc. 59-2, pp. 201-202; Doc. 59-3, p. 148; Doc. 59-4, p.45).

Sheriff Bullard offered to sit down with Connaway to discuss additional ideas to accommodate her needs, but Connaway did not respond (Doc. 49-4, pp. 235-237, 241; Doc. 49-18; Doc. 49-3, p. 214). Sheriff Bullard explained to Connaway that if the U.S. Marshals Service pulled their inmates from the Jefferson County Jail, it would have a serious negative effect on county revenues (Doc. 49-18).

### *Connaway's Termination*

Connaway's daughter Emily Potter, Potter's boyfriend Jeremy Sneed, and friend Zackary Spurlock were involved in a road rage incident on November 8, 2021. Sneed dropped Potter off at a gas station after an argument. Potter called Spurlock and Spurlock and his mother picked Potter up near the gas station (Doc. 49-19, pp. 19-26, p. 40). While driving, Spurlock noticed a silver Mercedes SUV he believed was owned by Sneed. The SUV began tailgating his car and at one point, pulled up next to Spurlock's vehicle and attempted to push him off the road. While the SUV was next to him, Spurlock saw that Sneed was driving the vehicle (Doc. 49-19., pp. 21, 27-34; Doc. 49-3, p. 233). Spurlock called 911 and while on the phone, made a U-turn and the SUV drove into a ditch. The recorded 911 call identifies the SUV and Sneed as the driver and includes Potter's screams reacting in real time to the danger being caused by Sneed (Doc. 49-19, pp. 30-34; Doc. 49-21). Spurlock reported that as he was driving away, he saw Connaway driving in the opposite direction toward the SUV in the ditch (Doc. 49-20, Doc. 49-21).

Connaway reported that she went to the gas station to pick up her daughter, but she had already gotten a ride from Spurlock (Doc. 49-4, pp. 164-170; 49-21). Connaway then called Sneed and told him she did not have enough gas to make it home and then back to work. Connaway and

Sneed agreed to switch cars. Connaway stated that after exchanging cars, she turned around because Sneed had left his checkbook in the SUV. Connaway then saw something, swerved to avoid it, and ended up in a ditch while driving the SUV (Doc. 49-4, pp. 164-170; 49-21). When the Wayne County Deputy who responded to the 911 call arrived at the scene, Connaway told him she was driving the SUV when it landed in the ditch (Doc. 49-4, pp. 229-235, Doc. 49-21). After learning of the incident, Sheriff Bullard appointed Lieutenant Mansker to open a personnel investigation into the events. *Id*.

Lieutenant Mansker investigated the November 8, 2021 incident, including interviewing Spurlock, his mother, and Connaway as well as reviewing the 911 recording and phone records. Lieutenant Mansker also attempted to interview Potter and Sneed, but both declined (Doc. 49-3, pp. 235-241, Doc. 49-21).

While the investigation was ongoing, Sheriff Bullard believed that Connaway had lied about her involvement in the November 8, 2021 incident. *Id*. He sent a text message to Lieutenant Burrell on November 23, 2021 stating, "Getting her interview scheduled. She is pretty much nailed on this one no matter which way she goes" (Doc. 59-23, Doc. 59-41).

Based on his review of the evidence, Lieutenant Mansker did not believe Connaway's version of the events and found her interview to be deceitful (Doc. 49-21). This was based on the credibility of the witnesses, the contemporaneous recording of the 911 call reporting Sneed driving the Mercedes SUV in the ditch, contradictory phone records that did not show Sneed on the phone with Connaway at the times she claimed, and the physical impossibility of the events occurring as Connaway alleged. *Id*. He concluded that Connaway gave false information to the Wayne County Deputy regarding the events (Doc. 49-4, p. 171, Doc. 49-3, p. 235, Doc. 49-21, Doc. 49-22). Sheriff Bullard agreed with the findings. *Id*. Giving false information in a police report and giving

false information to protect someone from criminal prosecution is a serious violation of the County's policies, and committing a criminal act is also a major violation of policy (Doc. 49-4, pp. 174-180).

On December 6, 2021, following her interview with Lieutenant Mansker, Sheriff Bullard sent a notice seeking Connaway's termination of employment before the Merit Commission for the following charges: giving false information in a police report; committing a criminal act; conduct unbecoming an officer; and making false statements during an administrative investigation. Connaway was placed on administrative leave until the hearing with the Merit Commission (Doc. 49-4, pp. 161-162, Doc. 49-22). From December 6, 2021, through December 28, 2021, the County continued to investigate Connaway's alleged misconduct (59-6, pp. 162-163, p. 218; Doc. 59-35, Doc. 59-36). Lieutenant. Mansker completed his investigative report on December 28, 2021.

Connaway opted to use an arbitrator to assess whether there was just cause for termination instead of having a hearing with the Merit Commission (Doc. 49-4, p. 163). When Connaway waived her right before the Merit Commission, her employment was formally terminated, and she then entered the grievance process (Doc. 49-4, p. 163; Doc, 49-3, p. 227). No one mentioned Connaway's sex or migraines during the investigation that led to her termination or at any time relative to her termination (Doc. 49-4, pp. 186-187).

## Discussion

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which

she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### Sexual Discrimination

The determinative question for a court at the summary judgment stage in a discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). A plaintiff can use the *McDonnell Douglas* framework to present such evidence but need not do so. The court "must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her [protected characteristic]." *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 720 (7th Cir. 2018); *see Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016).

To succeed on her sexual discrimination claim, Connaway must establish that: (1) she is a member of a protected class; (2) she was meeting Defendant's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual not in the protected class was treated more favorably than she was. *See Coleman v. Donahoe*, 667 F.3d 835, 835 (7th Cir. 2012). The County argues that Connaway cannot make out a *prima facie* case because she was not meeting her employer's legitimate work expectations, nor can she point to other similarly situated male employees who were treated more favorably.

With respect to its contention that Connaway was not meeting performance expectations, the County points to numerous disciplinary infractions – misconduct involving inmates, missing mandatory training, repeated violations of safety policies, and the events culminating her termination. Connaway made no response to the County's assertion that she was not meeting her work expectations, and her contention that her disciplinary infractions were a result of sexist harassment and created a hostile work environment is fatally insufficient, as a non-movant's failure to respond to arguments addressed in a summary judgment motion results in a waiver. *See Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017).

### Hostile Work Environment

To prevail on her claim for discrimination based on a hostile work environment, Connaway must show: (1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). "Courts look to several factors to determine whether alleged harassment was objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Id.*

Connaway argues the multiple disciplinary actions taken against her beginning shortly after Bullard became Sheriff, including written reprimands and suspensions and being assigned to the control room on an indefinite basis, subjected her to a hostile work environment. She maintains that Sheriff Bullard had an animus against her because she is a woman and that her sex was a

motivating factor in the actions the County took against her. She points to the sheriff telling her, "I know how manipulative you are. You're not going to get away with that here" which she took as an insinuation that she was manipulative because of her sex. But her perception of this statement without supporting facts or explanatory details is mere speculation and cannot support an inference of discrimination. *See Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007). Connaway acknowledges that other than this comment, Bullard never said anything to her that she identified as sexist, nor is she aware of him using derogatory terms regarding her or other females.

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Board of Educ. of City of Chicago,* 526 F.3d 1054, 1061 (7th Cir.2008) (internal citation omitted). While Connaway argues the County was more lenient with male employees when it came to imposing discipline, the evidence on record does not create a material issue of fact on this point.

Connaway does not dispute that she received discipline for engaging in misconduct involving inmates, giving false or misleading statements during an investigation, missing mandatory training, and violating County policies. There is no evidence that the discipline she received was because of her sex rather than because of her failure to follow procedure. Connaway does not refute Sheriff Bullard's testimony that no male correctional officers have a similar discipline history to Connaway, including prior terminations and suspensions, who have not received similar progressive discipline for similar offenses. In fact, she admits she cannot identify a similarly situated male correctional officer with her disciplinary record.

Viewing the totality of the evidence, Connaway fails to show that she was treated differently because of her sex or that any unfavorable treatment was severe or pervasive enough to create a hostile work environment.

### ADA

"In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn*, 753 F.3d at 682). "An employer need only provide a qualified individual with a 'reasonable accommodation, not the accommodation [the employee] would prefer." *Hoppe v. Lewis Univ.,* 692 F.3d 833, 840 (7th Cir. 2012).

The obligation to accommodate a disability also "brings with it a requirement that both the employer and the employee engage in a flexible 'interactive process' and make a 'good faith effort' to determine what accommodations are necessary." *Yochim v. Carson*, 935 F.3d 586, 591 (7th Cir. 2019) (citation omitted). "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *E.E.O.C. v. Sears*, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005).

There is no dispute that Connaway suffers from migraine headaches or that the County was aware of her migraines. The question is whether the County failed to reasonably accommodate her migraine condition. Connaway complained that working in the control room triggered her migraines and requested the following accommodations: (1) having the lights in the control room at a brighter setting; (2) finding a job outside of the control room; or (3) reducing the amount of time that she was required to work in the control room.

Connaway asserts that keeping the lights at a brighter setting would help with her migraines and that she was able to keep the lights in the control room turned on at a bright setting prior to Bullard becoming the sheriff. On April 11, 2019, John Scott the Jail Administrator asked Connaway why the lights in the control room were on. She explained that having the lights on helped with her migraines. After speaking with Bullard, Scott sent a message the following day to all correctional officers stating that having the light on in the control room was a safety and security issue.

Connaway does not dispute that the lights create a safety and security issue. In lieu of the lights being turned on, she requested a desk lamp to use in the control room, which the County provided. The fact that Connaway did not receive the specific accommodation she originally requested does not render the County's action unreasonable. *See Bunn*, 753 F.3d at 683 (explaining that where an employer provided a reasonable accommodation, plaintiff's "apparent displeasure with the way in which [the employer] decided on that accommodation, or with its failure to provide the exact accommodation he would have preferred, [was] irrelevant").

The ADA may require an employer to reassign a disabled employee to a different position as a reasonable accommodation where the employee can no longer perform the essential functions of their current position. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 291 (7th Cir. 2015). Connaway argues that she could have been moved to other assignments outside of the control room. However, she has not established that she was unable to perform the essential functions of her position with the addition of the desk lamp she requested and received. Significantly, other than working in the control room, there were no other jobs for correctional officers that did not require direct physical interaction with federal detainees. The County's decision to exclude Connaway from direct physical interaction with federal inmates was not unreasonable given her

disciplinary history and the request made by the U.S. Marshals Service. While Connaway contends the County should have worked around her limited access to federal detainees by having another correctional officer relieve her whenever a federal prisoner was around, "an employer is simply not required to create ... a new position to accommodate an employee under the ADA, regardless of the amount of hardship involved." *Stern*, 788 F.3d at 290.

The County did attempt to accommodate Connaway by allowing her to perform perimeter checks and take additional breaks if another employee was available to relieve her in the control room, but the County did not always have staff available to relieve her. Additionally, Bullard offered to sit down with Connaway to discuss additional ideas she had to accommodate her needs, but she did not respond to him.

On this record, the jury could not reasonably conclude that the County failed to reasonably accommodate Connaway's migraine condition.

### Retaliation

A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of her statutorily protected activity. Thus, Connaway must prove that she engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity. *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). In this context, causation means but-for causation. *Lord*, 839 F.3d at 563. "[C]ausation can be established by circumstantial evidence," such as "suspicious timing, a pretextual explanation for the [adverse employment action], and evidence that similarly situated employees were treated differently."

*Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). When the plaintiff has provided circumstantial evidence of a retaliatory motive, her employer may then show that the adverse employment action would have been taken against the employee "even absent her [engaging in the protected activity]"—undercutting retaliation as the but-for cause of the adverse action. *Lord*, 839 F.3d at 564. However, the plaintiff can avoid summary judgment if she shows that a genuine dispute of material fact exists as to whether the employer's purported motive is pretextual. *Id.*

The County maintains that Connaway was terminated for giving false information in a police report, committing a criminal act, conduct unbecoming an officer, and making false statements during an administrative investigation stemming from the November 2021 incident, coupled with her disciplinary history. Citing *Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 407 (7th Cir. 2007), *aff'd,* 553 U.S. 442 (2008), Connaway asserts that the County had already concluded she had engaged in improper conduct and that her discharge was warranted before completing its investigation and before getting her side of the story. In *Humphries*, the Seventh Circuit concluded there was sufficient circumstantial evidence from which a jury could conclude that plaintiff's employer had set him up. But *Humphries* is distinguishable because the employer conducted no investigation before firing the plaintiff for an alleged minor infraction and there was no evidence that the employer fired anyone else for similar missteps. That's not the case here.

Lieutenant Mansker performed an investigation which included interviewing witnesses, listening to the 911 audio recordings, and interviewing Connaway. Although the decision to terminate Connaway was made on the same day as her interview, the decision came after her interview and after a determination was made from the evidence gathered her version of events was unlikely. Courts intervene in personnel disputes "only where an employer's reason for [an adverse action] is without factual basis or is completely unreasonable." *Nicholson v. City of*

*Peoria, Ill.*, 860 F.3d 520, 524 (7th Cir. 2017). Based on the record, the County's stated reason for terminating Connaway was neither factually baseless nor unreasonable. Accordingly, it is entitled to summary judgment on Connaway's retaliation claim.

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** in its entirety. The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close this case.

**IT IS SO ORDERED.**

**DATED:  March 30, 2023**

**STACI M. YANDLE**
**United States District Judge**